**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH OSBORNE DAVID, RAVIKANTH KOTTU, and SUNNY RIDGE CREATIVE LLC,<br><br>      Plaintiffs,<br><br>v.<br><br>LATE STAGE MANAGEMENT, LLC; LATE STAGE ASSET MANAGEMENT, LLC; CAPITAL TRUTH HOLDINGS, LTD.; CAPITAL TRUTH HOLDINGS LTD., SAC1; TRILLER GROUP INC.; TRENDY REACH HOLDINGS LIMITED; GIGAFUND MANAGEMENT COMPANY, LLC; FORTUNE PRE-IPO OFFSHORE FUND, LTD; MARCELLO FOLLANO; and JOSHUA CILANO.<br><br>      Defendants. | Docket No. 26-cv-4601<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Joseph Osborne David, Ravikanth Kottu, and Sunny Ridge Creative LLC, bring this Complaint against Defendants Late Stage Management, LLC, Late Stage Asset Management, LLC, Capital Truth Holdings Ltd., Capital Truth Holdings, Ltd. SAC1, Triller Group Inc., Trendy Reach Holdings Limited, Gigafund Management Company, LLC, Fortune Pre-IPO Offshore Fund, Ltd., Marcello Follano, and Joshua Cilano. Plaintiffs make the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is an action to recover and to preserve, pending adjudication, specific and identifiable property: pre-IPO shares of Space Exploration Technologies Corp. ("SpaceX") purchased with investor money—a block of 3,917,185 pre-IPO share equivalents worth as much as $478 million at recent market prices—that Defendants are attempting to strip from its owners through fabricated records, unauthorized "carry" deductions, and an offshore transfer for a purchase price that has never been paid.

2. If the offshore transfer is consummated, Plaintiffs' shares will likely be unrecoverable forever.

3. The fraud was built on defunct corporate shells. Defendant Late Stage Asset Management, LLC (the fund manager identified to investors) had its Delaware certificate cancelled in 2018, two years before Plaintiffs bought their shares.

4. As set forth in a July 13, 2020 Stock Purchase Agreement, the predecessor to Defendant Capital Truth Holdings, Ltd. ("Capital Truth")—the Bahamian custodian at the center of this case—sold pre-IPO SpaceX shares to a Late Stage fund as "record owner" of those shares.[1]

5. In September and October 2020, Plaintiffs invested in pre-IPO interests in SpaceX through Late Stage series funds following the receipt of a Private Placement Memorandum that promised: "The Manager shall not transfer the investments of a particular Series without a majority of the Members of such Series consenting to the transfer."[2]

6. Behind that promise, Capital Truth then purportedly entered into an agreement on December 15, 2020 with Late Stage, granting it the "sole and expressed right to sell any positions assigned and assumed by Late Stage Management LLC."[3]

7. In other words, Capital Truth sold SpaceX positions into the Late Stage funds for investors' money (including Plaintiffs)—and then, after Plaintiffs had already invested, took back from Late Stage the exclusive right to sell those very same positions. No investor was ever told.

8. SpaceX went public on June 12, 2026 at $135 per share and closed at $156.11 on June 23, 2026. In that same window, Late Stage's investor portal went dark—*i.e.*, investors could not access information about their holdings with Late Stage. When access became available again on June 23, Plaintiffs' SpaceX positions had been erased: retroactively marked "sold" as of September 23, 2024. No such sale ever happened. The purported sales were backed by backdated "email histories" that no Plaintiff ever received. Each purported sale for each Plaintiff was at the exact same $105 per share pre-split price,

---

[1] **Exhibit A**, July 13, 2020 Stock Purchase Agreement.

[2] **Exhibit B**, Subscription Booklet, at 24.

[3] **Exhibit C**, Capital Truth-Late Stage Retroactive Memorandum.

with offers to refund "unapplied contributions" computing to a uniform, identical $90.90 pre-split share for each Plaintiff. Because SpaceX split twice pre-IPO, this resulted in the purported sale value being approximately fifteen cents on the dollar compared to the shares' market value on June 23, 2026.

9. The September 2024 purported sale is a demonstrable, documented fabrication and Plaintiffs' records prove it. Plaintiffs' holdings reports (downloaded at the time they were issued in 2024 and 2025) show the SpaceX positions still held long after September 2024. So do the Schedule K-1s that Late Stage itself prepared.

10. The fabrication is also reflected on the Late Stage portal entries that purportedly documented the sales. On June 23, 2026, the portal represented that the sale took place on December 31, 2024.[4] Three days later, the portal stated that the sale was on September 23, 2024.[5]

11. The sale of Plaintiffs' SpaceX interests is also irreconcilable with the legal status of Late Stage Management LLC, the Manager of the funds. That entity was cancelled by the Delaware Secretary of State on July 10, 2024—months before the date of the purported sale—for failure to appoint a registered agent.

12. The reports were altered again on July 22, 2026 — while these events were before Judge Matsumoto in the related action.[6]

13. On June 23, 2026, the day the portal came back, Capital Truth agreed to sell another of its affiliates (Defendant Capital Truth Holdings Ltd., SAC1 ("SAC1")—the Bahamian segregated account holding the SpaceX block) to Defendant Trendy Reach Holdings Limited ("Trendy Reach"), a British Virgin Islands entity operating out of Hong Kong. Defendant Triller Group Inc. ("Triller") was listed as the "Buyer Manager." And the purchase price was $411,304,425—3,917,185 share equivalents at exactly the $105 per-share figure, albeit calculated post-5:1 split, inserted into the fabricated investor sale notices.

---

[4] **Exhibit D**, June 23, 2026 Portal Screenshot by Joseph Osborne David.

[5] **Exhibit E**, June 26, 2026 Portal Screenshot by Joseph Osborne David.

[6] **Exhibit F**, March 2026 Holdings Report of Joseph David, as it appeared on July 22, 2026.

14. The document governing the June 23, 2026 sale agreement was a Membership Interest Purchase Agreement (the "MIPA").[7] Defendant Cilano signed the MIPA three times: for the Seller (Capital Truth), for SAC1 (the entity being sold), and for an unidentified "Company Managing Member."

15. The MIPA's schedules were omitted from Triller's public Form 8-K announcing the deal.[8] Instead, investors found out for the first time the self-dealing baked into the deal: a footnote to Schedule I states that "carried interest and like charges . . . will reduce the delivered shares to approximately 635,000 shares (3,175,000 post 5-for-1 split)."[9] This never-disclosed provision authorized the skimming of approximately 740,000 SpaceX share equivalents (*i.e.*, the total number of 3,915,000 less the 3,175,000). This was well over $100 million at the June 23 close. The beneficiary is not stated in the MIPA. Again, no Plaintiff ever agreed to this and it was never disclosed publicly.

16. This was not the only planned diversion of Plaintiffs' interests. The remaining 3,175,000 share equivalents would be sent offshore to Trendy Reach—beyond Plaintiffs' reach—at an effective price of $129.54 per delivered share (*i.e.*, $411,304,425 / 3,175,000).

17. The $411 million purchase price also never existed. The transaction was scheduled to close on or around July 22, 2026 but never did. After being ordered by the Court in the *Evangelista* action, Trendy Reach's and Triller's Chief Executive Ng Wing Fai swore on July 26, 2026 in a declaration executed in Doha, Qatar, that "[n]o funds or other consideration has been delivered to Capital Truth Holdings Ltd. or Capital Truth Holdings, Ltd. SAC1 or anyone else including any escrow agent." Fai averred that the failure to obtain funding was attributable to armed conflict involving Iran disrupting financing expected from "lenders or investors based in Abu Dhabi and Singapore."

---

[7] **Exhibit G**, June 23, 2026 Membership Interest Purchase Agreement. See **Exhibit H** for the MIPA with signatures for Capital Truth, SAC1, and an unidentified "Company Managing Member." **Ex. H** was produced for the first time in the *Evangelista* litigation, at Docket No. 144-3.

[8] Compare **Ex. G** with **Ex. H**.

[9] **Ex. H**.

18. When the transaction failed to close, the Court in the *Evangelista* action ordered that any proceeds be wired directly to the Clerk of Court. Defendants then disclosed a July 26, 2026 Extension Notice stating that the deal would close on or before August 26, 2026.[10]

19. The Extension Notice also quietly redirected any escrowed funds to "the IOLA escrow account of Gusrae Kaplan Nusbaum PLLC"—Capital Truth and Cilano's own litigation counsel in the *Evangelista* action—rather than the Clerk of Court.[11] Two days prior, that same counsel promised the Court that any transaction proceeds "would go directly to the Clerk of Court as per your earlier order."[12]

20. Also at the July 24, 2026 hearing, Cilano (under oath), invoked the Fifth Amendment as to every substantive question, including whether he controls his own companies.[13] In a subsequent filing, Follano invoked the Fifth Amendment "on behalf of myself and Late Stage Asset Management, LLC"[14]

21. Plaintiffs seek (1) a declaration of their rights in the SpaceX block and its proceeds; (2) a constructive trust and equitable lien over their shares, share equivalents, and all traceable proceeds, wherever they may be held (including any funds deposited with the court in the *Evangelista* action); (3) damages for conversion, fraud, and violations of the federal securities laws; (4) avoidance of fraudulent conveyances; (5) an accounting; and (6) relief to preserve the status quo (including that no deductions be taken from the block of shares scheduled to be sold and that any transaction proceeds be deposited with the Clerk of Court, not to Defendants' counsel's trust account, pending adjudication of this dispute).

## **PARTIES**

22. Plaintiff Joseph Osborne David is a US citizen and resident of Northville, Michigan. David invested in pre-IPO SpaceX securities through Late Stage in October 2020.

23. Plaintiff Ravikanth Kottu is a US citizen and resident of Fremont, CA. Kottu invested in pre-IPO SpaceX securities through Late Stage in September 2020.

---

[10] **Ex. I**, MIPA Extension Notice.

[11] *Id.* The Extension Notice is not signed by Capital Truth Holdings Ltd., the Seller to the SAC1 transaction.

[12] **Ex. J**, July 24, 2026 Evangelista Status Conference Hearing Transcript, at 31:20-22.

[13] *Id.* at 13:1-15:15.

[14] **Ex. K**, Declaration of Marcello Follano.

24. Plaintiff Sunny Ridge Creative LLC ("Sunny Ridge") is a New York limited liability company. Sunny Ridge invested in pre-IPO SpaceX securities in September 2020. Sunny Ridge's members are John Lifrieri and Josh Kale.

25. John Lifrieri is a US citizen and resident of Mahopac, New York. Josh Kale is a US citizen and resides in Mohegan Lake, New York. Kale maintains a residence in Brooklyn, NY. Therefore, Sunny Ridge is also a citizen of New York.

26. Defendant Late Stage Management, LLC was a Delaware limited liability company that was headquartered in Montclair, NJ. Defendant Late Stage Asset Management, LLC also was a Delaware limited liability company that is headquartered in Montclair, NJ. Late Stage Asset Management, LLC has operated under Late Stage Management, LLC and various other Late Stage entities, including Late Stage Funds. Late Stage Asset Management's Delaware certificate was cancelled in 2018. Late Stage Management's Delaware certificate was cancelled on July 10, 2024. Although both entities have been cancelled by the Delaware Secretary of State, the enterprise continued to operate in their names—selling series interests, administering the investor portal, issuing Schedule K-1s, and sending investor communications—through and at the direction of Defendants Follano and Cilano, who are personally responsible for those acts. References to "Late Stage" are to that enterprise and those acting in its name.

27. Defendant Capital Truth Holdings, Ltd. is an entity organized under the laws of The Bahamas. In November 2020, Capital Truth Holdings LLC merged into Capital Truth as a non-surviving corporation.

28. Defendant Capital Truth Holdings Ltd., SAC1 is an entity organized under the laws of the Bahamas. SAC1 is wholly owned by Capital Truth.

29. Defendant Triller Group Inc. ("Triller") is a Delaware corporation headquartered in Los Angeles, California.

30. Defendant Trendy Reach Holdings Limited ("Trendy Reach") is an entity organized under the laws of the British Virgin Islands. Trendy Reach is a wholly-owned subsidiary of Triller.

31. Defendant Gigafund Management Company, LLC ("Gigafund") is a Delaware limited liability company headquartered in Austin, TX.

32. Defendant Fortune Pre-IPO Offshore Fund, Ltd. ("Fortune") is an entity organized under the laws of the British Virgin Islands. Fortune is managed by Gigafund.

33. Defendant Marcello Follano was the founder, Managing Partner, and President of Late Stage and related Late Stage entities. Upon information and belief, Follano resides in Caldwell, NJ. Following the wind-down of Late Stage, Follano has held himself out as a principal of Late Stage.

34. Defendant Joshua Cilano is the President, Sole Authorized Person and Managing Member of Capital Truth. Cilano resides in Wellington, Florida. When asked under oath in open court on July 24, 2026 whether he is the CEO or person with a controlling interest in the Capital Truth entities, Cilano invoked the Fifth Amendment.

## JURISDICTION AND VENUE

35. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because Plaintiffs assert claims arising under Section 10(b) of the Exchange Act and SEC Rule 10b-5.

36. This Court has supplemental jurisdiction over Plaintiffs' related state-law and equitable claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiffs' federal securities claim.

37. This Court also has jurisdiction to grant declaratory and equitable relief under 28 U.S.C. §§ 2201 and 2202, concerning specific property and proceeds implicated by the SAC1 transaction and the existing *Evangelista* action, including $411 million in proceeds that will be escrowed into the Court if the SAC1 transaction closes.

38. This Court has personal jurisdiction over Late Stage and Follano. Late Stage Asset Management, LLC and Follano are already defendants in the *Evangelista* action and the claims against Late Stage Management, LLC arise from Late Stage's sale, administration, reporting, and alleged recharacterization of investor interests, including interests sold to investors in this District.

39. This Court has personal jurisdiction over Capital Truth and Cilano. Cilano is already a defendant in the *Evangelista* action and Capital Truth had contractual authority to sell positions assigned and assumed by Late Stage and now seeks to transfer SpaceX share equivalents traceable to Late Stage in the SAC1 transaction.

40. This Court has personal jurisdiction over SAC1 because SAC1 is the specific vehicle through which Capital Truth seeks to transfer the SpaceX share equivalents at issue. SAC1's asserted rights to the SpaceX share equivalents are central to the SAC1 transaction challenged here, and Plaintiffs seek relief to determine and preserve property rights in the SpaceX interests held by or through SAC1.

41. This Court has personal jurisdiction over Triller and Trendy Reach because, after being placed on notice of disputed investor claims, Triller and Trendy Reach seek to acquire SAC1 and the embedded SpaceX share equivalents. Plaintiffs' claims arise from the threatened acquisition of disputed property traceable to the pre-IPO securities structure between Late Stage and Capital Truth that is at issue in the *Evangelista* action.

42. This Court has personal jurisdiction over Gigafund and Fortune because they are alleged to manage, hold, control, or administer SpaceX shares or share equivalents implicated by the SAC1 transaction. Declaratory and injunctive relief is necessary to determine and protect the status of the disputed property.

43. Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. § 78aa. A substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the receipt of falsified portal records, backdated notices, and communications directed to Sunny Ridge in Kings County. Plaintiffs also assert Exchange Act claims and acts or transactions constituting the alleged violations occurred in this District. Venue is proper as to foreign Defendants Capital Truth, SAC1, Trendy Reach, and Fortune, which may be sued in any judicial district and are disregarded in determining venue. 28 U.S.C. § 1391(c)(3).

44. This action should be related to and consolidated or coordinated with *Evangelista*, No. 1:24-cv-05292-KAM-MMH, because both actions concern Late Stage's sale of pre-IPO securities, Capital Truth's role in acquiring, holding, selling, or transferring those securities, and investors' claims to specific securities and proceeds that may be escrowed by the Court.

45. This action is also related to *SEC v. Pirrello*, No. 2:23-cv-00853 (E.D.N.Y.) and *United States v. Pirrello*, No. 1:23-cr-00499 (E.D.N.Y.), in which four participants in the Late Stage sales network pleaded guilty in connection with an illegal scheme that raised approximately $528 million from investors.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

**I.      Plaintiffs Invested in Pre-IPO SpaceX Interests through Late Stage.**

46.      Between September 2020 and October 2020, Plaintiffs invested in pre-IPO SpaceX interests through Late Stage and affiliated Late Stage investment fund vehicles. Plaintiffs understood that their investments would earn them the right to receive and transfer shares of SpaceX stock following the expiration of a lock-up period after the company's IPO.

47.      Plaintiffs' investments were made through a Confidential Private Placement Memorandum, an Operating Agreement, and a Subscription Agreement. The Private Placement Memorandum's introduction directed investors to "closely review the Operating Agreement and the Private Placement Memorandum for a detailed description of the fund and the rights associated with the SpaceX series interests."

48.      The Private Placement Memorandum states: "The Manager shall not transfer the investments of a particular Series without a majority of the Members of such Series consenting to the transfer."[15] No vote or consent of the members of any series in which Plaintiffs invested was ever sought or obtained for any sale, liquidation, or transfer of that series' SpaceX investments.

49.      The funds were organized as series of Delaware limited liability companies, whose assets are statutorily segregated by series under 6 Del. C. § 18-215. Each Plaintiff's series held a specifically identified SpaceX allocation as ring-fenced property of that series, held for the benefit of that series' members.

50.      The Stock Purchase Agreement stated that Capital Truth Holdings LLC was the record owner and holder of the SpaceX stock being sold. Exhibit A to the Stock Purchase Agreement identified 12,541 SpaceX shares at $285 per share, for a total purchase price of $3,574,185.[16]

51.      The Stock Purchase Agreement directly ties Capital Truth entities to the sale of SpaceX shares to a Late Stage fund. The agreement also supports that Capital Truth entities were part of the

---

[15] **Ex. B** at 3.

[16] *See* **Ex. A**.

structure through which Late Stage acquired, held, sold, or monetized SpaceX interests for Late Stage investors.

52. When Late Stage received money from its investors, it transferred the money to Capital Truth entities. Capital Truth would hold the actual shares of SpaceX until the IPO. Once the shares were publicly traded and the lock-up period expired, Capital Truth was supposed to distribute shares to Late Stage, who would in turn distribute the shares to Late Stage investors.

53. Capital Truth was also directly connected to Late Stage through an agreement concerning the sale of positions associated with Late Stage. A memorandum dated December 19, 2025 from Capital Truth to Late Stage Management, LLC confirmed a purported prior December 15, 2020 agreement between Capital Truth and Late Stage Management, LLC.[17]

54. The memorandum stated that Capital Truth had the "sole and expressed right to sell any positions assigned and assumed by Late Stage Management, LLC" so long as the sale of the position was deemed beneficial to all parties. The memorandum was accepted and agreed to by Joshua Cilano for Capital Truth and Marcello Follano for Late Stage Management, LLC.

55. The December 19, 2025 memorandum bears its own badge of fabrication: it is addressed to Late Stage Management, LLC (an entity whose Delaware certificate had been cancelled seventeen months earlier), suggesting that the enterprise's records were papered after the fact.

56. Late Stage maintained holdings and account records through an online investor portal. Late Stage also issued reports and statements concerning investor holdings. Until June 18, 2026, those records confirmed Plaintiffs' continued positions in SpaceX.

57. Plaintiffs were passive investors in private fund vehicles. They had no independent ability to verify whether Late Stage, Capital Truth, SAC1, Fortune, Gigafund, or any related entity actually held their SpaceX shares or whether those shares had been sold, transferred, pledged, or otherwise disposed of.

58. Plaintiffs therefore relied on Late Stage's investor portal, records, reports, and communications to determine the existence and status of their SpaceX investments. Until June 18, 2026, those sources all confirmed Plaintiffs' continued positions in SpaceX.

---

[17] **Ex. C**.

59. Late Stage knew that Plaintiffs and other investors would rely on those records and communications because Late Stage controlled the investor-facing records and was the only source of account-level information for Plaintiffs' SpaceX interests.

**A. Plaintiff David's SpaceX Position with Late Stage.**

60. On October 27, 2020, David invested $17,250 through Late Stage in the company's Series SPSX-X6a, which at the time held a beneficial interest in 1,174 shares of common stock of SpaceX. In exchange, David was entitled to 50 pre-IPO shares of SpaceX at a purchase price of $345/share.

61. Following a 10:1 stock split in February 2022, David's monthly holdings reports reflected his SpaceX position as 500 shares at an average price of $34.50 per share.

62. Following a subsequent 5:1 stock split in May 2026, David's portal should have displayed 2,500 SpaceX shares at an average price of $6.90 per share.

63. David maintained records relating to his Late Stage investment, including acceptance letters, Schedule K-1s, holdings reports, portal screenshots, and emails.

64. David downloaded his March 2026 holdings report from the Late Stage portal on May 11, 2026. This report showed that his SpaceX position remained intact in March 2026, long after any date on which Late Stage now claims the position had been sold.[18]

65. Between June 18 and June 23, 2026, Late Stage's investor portal became inaccessible. Upon restoration of the investor portal, David observed that the portal's email history section contained an alleged SpaceX sale email that David had never received.

66. On June 23, 2026, at approximately 2:58 PM CDT, David took a screenshot of the email-history section of his Late Stage portal. The screenshot showed an email entry that David had never received, which purported to inform David his SpaceX position was removed and sold. This email stated that David's SpaceX shares had been sold at a pre-5:1 split price of $105.00 per share, for a current effective price of $21.00 per share. At the time, the email-history entry was dated December 31, 2024.[19]

---

[18] David's March 2026 holdings report, as it appeared on May 11, 2026, is attached hereto as **Exhibit L**.

[19] **Ex. D**.

67. Instead of displaying his SpaceX interests, the portal showed David an offer to return an "unapplied contribution" of $45,450.00.

68. On the same day, the Late Stage investor portal again became unavailable.

69. On June 26, 2026, at approximately 11:41 am, after the portal came back online, David again accessed the email-history section of his Late Stage portal and took another screenshot.[20]

70. This screenshot showed the same SpaceX-related email entry, but the date shown for that email had changed from December 31, 2024 to September 23, 2024.

71. David did not receive contemporaneous notice in either September 2024 or December 2024 that his SpaceX shares or SpaceX-related interests had been sold. David did receive other emails from Late Stage during this time.

72. David did not authorize any sale of his SpaceX position.

73. David did not receive any proceeds from any alleged sale.

74. David's contemporaneously-downloaded March 2026 holdings report, conflicting June 23 and June 26 portal screenshots, and 2024 K-1 are inconsistent with Late Stage's claim that David's SpaceX position had been sold on September 23, 2024.

75. On July 22, 2026, Late Stage again altered David's monthly holdings reports.

76. After the portal outage and before July 22, 2026, David's monthly holdings reports for the period after September 2024 did not reflect any active SpaceX position, only an unapplied contribution that purported to be the proceeds of a September 2024 sale with carried interest subtracted.

77. However, after July 22, 2026, David's monthly holdings reports from September 2024 to May 2026 were altered to include both an active pre-5:1 split position in SpaceX and the unapplied contribution amount.[21] The June 2026 monthly holdings report continued to reflect only the unapplied contribution amount.

78. To date, David has not received his SpaceX shares or any cash disbursement from any alleged sale.

---

[20] **Ex. E**.

[21] **Ex. F**.

79.     On June 23, 2026, shares of SpaceX closed at a price of $156.11 per share.

**B. Plaintiff Kottu's SpaceX Position with Late Stage.**

80.     On September 23, 2020, Kottu invested $34,500 through Late Stage in the company's Series SPSX-X5a, which at the time held a beneficial interest in 525 shares of common stock in SpaceX. In exchange, Kottu was entitled to 100 pre-IPO shares of SpaceX at a purchase price of $345/share.

81.     Following a 10:1 stock split in February 2022, Kottu's monthly holdings reports reflected his SpaceX position as 1,000 shares at an average price of $34.50 per share. That position appeared without material change through at least May 2026.

82.     Following a subsequent 5:1 stock split in May 2026, Kottu's investor portal should have displayed 5,000 SpaceX shares at an average price of $6.90 per share.

83.     Upon restoration of the investor portal on June 23, 2026, Kottu's position was removed and marked sold as of September 23, 2024, with an offer to return an "unapplied contribution" of $90,900.00.

84.     Kottu did not receive any contemporaneous notice of a September 2024 sale.

85.     Kottu did not authorize any sale of his SpaceX position.

86.     Kottu did not receive any distribution from the alleged September 2024 sale.

87.     On June 9, 2026, three days before SpaceX's IPO, Kottu emailed Late Stage asking what next steps were required because SpaceX was expected to IPO.[22]

88.     On the same day, Late Stage responded. Late Stage did not state in its response that Kottu's SpaceX position had already been sold in September 2024. Instead, Late Stage discussed future delivery mechanics, stating that (1) the lockup period would be 180 days, (2) delivery was not immediate, (3) there was no update to post until the IPO occurred, (4) the stock split would reflect in the portal after third-party broker confirmation, and (5) an email would be sent with delivery steps.

89.     Kottu reasonably understood this June 9, 2026 communication to mean that his SpaceX position remained active and that Late Stage was still awaiting IPO, confirmation of stock split, and delivery events. Late Stage's June 9, 2026 email is inconsistent with Late Stage's later claim that Kottu's SpaceX position had been sold on September 23, 2024.

---

[22] Kottu's June 9, 2026 correspondence with Late Stage is attached hereto as **Exhibit M**.

90. Following the first portal outage, an email dated September 23, 2024 appeared in the "Email History" section of Kottu's investor portal. The email was titled "[Action Required] – Important Information About Your Delivery for SpaceX!" This email stated that Kottu's SpaceX shares had been sold at a pre-5:1 split price of $105.00 per share, for a current effective price of $21.00 per share.

91. On July 3, 2026, Late Stage claimed that an email had been sent to Kottu on September 23, 2024 stating that his SpaceX block had been sold and that Kottu was required to provide wire instructions.

92. Kottu did not receive that email when it was allegedly sent. Kottu received other emails from Late Stage in the time around September 23, 2024.

93. Late Stage also stated in the July 3 email that, because of a pending SEC case and a forensic audit, the system had been incorrectly reporting Kottu's SpaceX position since September 2024 and had to be updated to reflect a 2024 sale.

94. Late Stage further stated that Kottu's 2024 and 2025 K-1s would have to be revised because the "K1 details are taken from the portal."

95. Late Stage's own communications therefore confirm that its portal, K-1s, and account records were inconsistent with the claimed 2024 sale.

96. Late Stage's course of action regarding the SpaceX shares is inconsistent with their prior dealings relating to pre-IPO shares in other companies. For example, Kottu also previously held an Instacart position through Late Stage.

97. When Late Stage actually processed Kottu's Instacart position, Late Stage sent repeated communications, including IPO notices, action-required distribution notices, distribution updates, and a final confirmation that the distribution had been sent.[23]

98. Kottu did not receive comparable SpaceX sale or distribution notices before Late Stage later claimed that his SpaceX position had been sold in September 2024.

99. Kottu's monthly holdings reports and 2024 Schedule K-1, prepared by Late Stage, do not show that his SpaceX shares were sold in those years.

100. On July 22, 2026, Late Stage again altered Kottu's monthly holdings reports.

---

[23] A screenshot of Kottu's email history from Late Stage regarding his Instacart position is attached hereto as **Exhibit N**.

101. After the portal outage and before July 22, 2026, Kottu's monthly holdings reports for the period after September 2024 did not reflect any active SpaceX position, only an unapplied contribution that purported to be the proceeds of a September 2024 sale with carried interest subtracted.

102. However, after July 22, 2026, Kottu's monthly holdings reports from September 2024 to May 2026 were altered to include both an active pre-5:1 split position in SpaceX and the unapplied contribution amount. The June 2026 monthly holdings report continued to reflect only the unapplied contribution amount.

103. To date, Kottu has not received his SpaceX shares or any cash disbursement.

104. On June 23, 2026, shares of SpaceX closed at a price of $156.11 per share.

**C. Plaintiff Sunny Ridge's SpaceX Position with Late Stage.**

105. On September 18, 2020, Sunny Ridge invested $28,500 through Late Stage in the company's Series SPSX-19A, which at the time held a beneficial interest in 1,677 shares of common stock in SpaceX. Late Stage's acceptance letter stated that Sunny Ridge's contribution was applied to 82 pre-IPO shares of SpaceX at a purchase price of $345/share, although Late Stage's subsequent records carried the position as 83 shares.

106. Sunny Ridge's subscription was funded by two wires of $14,250 each, one sent by John Lifrieri and one sent by Josh Kale.

107. Following a 10:1 stock split in February 2022, Sunny Ridge's monthly holdings reports reflected its SpaceX position as 830 shares. That position appeared without material change through at least November 2024, as reflected in a holdings report downloaded in December 2024.

108. Following a subsequent 5:1 stock split in May 2026, Sunny Ridge's investor portal displayed 4,150 SpaceX shares. On June 15, 2026, the live portal still showed Sunny Ridge's position as "Holding 4,150 / Delivered 0."

109. Sunny Ridge maintained records relating to its Late Stage investment, including subscription documents, acceptance letters, side letters, monthly holdings reports, Schedule K-1s, portal screenshots, wire transfer confirmations, and emails.

110. Between approximately June 18 and June 23, 2026, Late Stage's investor portal became inaccessible. When Lifrieri next reviewed Sunny Ridge's account on or about July 6, 2026, Sunny Ridge's

SpaceX position had been removed and marked sold as of September 23, 2024, with an offer to return an "unapplied contribution" of $75,447.00.

111.    Sunny Ridge did not receive any contemporaneous notice of a September 2024 sale.

112.    Sunny Ridge did not authorize any sale of its SpaceX position.

113.    Sunny Ridge did not receive any distribution from the alleged September 2024 sale.

114.    On July 6, 2026, Late Stage told Lifrieri that Sunny Ridge's SpaceX shares had been sold on September 23, 2024 at a pre-5:1 split price of $105.00 per share, for a current effective price of $21.00 per share.

115.    Late Stage also claimed that an email dated September 23, 2024 had notified Sunny Ridge of the sale.

116.    Sunny Ridge did not receive that email when it was allegedly sent. Lifrieri's complete Gmail export, including Spam and Trash, does not contain the alleged September 23, 2024 SpaceX sale email.

117.    Sunny Ridge did receive other communications from Late Stage during the period when Late Stage now claims wire instructions were outstanding. Specifically, Sunny Ridge received "NO ACTION REQUIRED" portal notices from Late Stage on or about December 7, 2024, January 13, 2025, and March 24, 2026.[24]

118.    Sunny Ridge's November 2024 holdings report, downloaded in December 2024, showed Sunny Ridge's SpaceX position held.[25] The same November 2024 report, as regenerated by the portal in July 2026, was empty. Late Stage therefore produced two irreconcilable versions of the same monthly holdings report for Sunny Ridge.

119.    On December 7, 2024, Sunny Ridge received an email from Late Stage president Marcello Follano. This email stated that, despite an SEC investigation resulting in changes and challenges, "[f]irst and foremost, all of your holdings are stable and will be delivered as best as we can when they become available and delivered based on how we are allowed to do so at that time."[26]

---

[24] A full download of Sunny Ridge's email history with Follano and Late Stage is attached hereto as **Exhibit O**.

[25] Sunny Ridge's November 2024 monthly holdings report, as it appeared in December 2024, is attached hereto as **Exhibit P**.

[26] **Ex. O** at 8.

120. On January 14, 2025, Lifrieri emailed Late Stage president Marcello Follano asking whether Sunny Ridge could sell its SpaceX interest at current market value. Late Stage responded that it was not a brokerage firm and did not state that Sunny Ridge's SpaceX position had already been sold.[27]

121. Sunny Ridge's 2024 Schedule K-1, prepared by Late Stage's tax preparer, does not show that Sunny Ridge's SpaceX shares were sold in 2024. The K-1 reports no disposition, no capital gain, no distributions, and no sale or exchange of Sunny Ridge's partnership interest. No 2025 Schedule K-1 has been issued to Sunny Ridge.

122. On July 22, 2026, Sunny Ridge noticed that Late Stage had again altered its monthly holdings reports.

123. After the portal outage and before July 22, 2026, Sunny Ridge's monthly holdings reports for the period after September 2024 did not reflect any active SpaceX position, only an unapplied contribution that purported to be the proceeds of a September 2024 sale with carried interest subtracted.

124. However, after July 22, 2026, Sunny Ridge's monthly holdings reports from September 2024 to May 2026 were altered to include both an active pre-5:1 split position in SpaceX and the unapplied contribution amount.[28] The June 2026 monthly holdings report continued to reflect only the unapplied contribution amount.

125. To date, Sunny Ridge has not received its SpaceX shares or any cash disbursement.

126. On June 23, 2026, shares of SpaceX closed at a price of $156.11 per share.

## II. Late Stage's Records and Communications Raise Doubts about the Veracity of these Alleged Stock Sales.

127. Late Stage's current investor portal records contend that some or all of Plaintiffs' SpaceX positions were sold as of September 23, 2024.

128. Plaintiffs' historical monthly holdings reports show those SpaceX positions as continuing after September 2024.

---

[27] *Id.* at 12-13.

[28] Sunny Ridge's May 2026 monthly holdings report, as it appeared after July 22, 2026, is attached hereto as **Exhibit Q**.

129. Plaintiffs' 2024 and 2025 Schedule K-1s do not reflect that those positions were sold in those years.

130. Plaintiffs did not authorize, receive contemporaneous notices of, or receive proceeds from any alleged September 2024 sale.

131. Late Stage's after-the-fact recharacterization of Plaintiffs' SpaceX positions as "unapplied contribution[s]" is inconsistent with Late Stage's prior written representations, monthly holdings reports, K-1s, and investor portal records.

132. The "unapplied contribution" amounts offered to Plaintiffs also each compute to an identical $90.90 per pre-split share. This identical, uniform number across three different individuals bears the indicia of fraud, as three separate individual sales in 2024 would not yield the same price per share rather than the identical fraudulent purported sale price generated in 2026.

133. After the portal outage, Late Stage told Plaintiffs that their SpaceX shares had been sold in September 2024.

134. Late Stage told some investors, including Kottu, that an email had been sent concerning the sale and that investors were required to provide wire instructions. Late Stage further stated that its system had been incorrectly reporting the SpaceX positions as still held.

135. Late Stage represented that a forensic audit conducted in concert with an investigation by the Securities and Exchange Commission (SEC) had flagged the issue. However, Late Stage has not provided additional details regarding the alleged sale to investors when asked.

136. Late Stage's explanation requires accepting that its investor portal, monthly holdings reports, email-history records, and tax records all incorrectly reflected active SpaceX positions for extended periods after September 2024.

137. Late Stage's explanation also requires accepting that those records were only corrected after the June 2026 portal outage and are again incorrect after Late Stage's July 22, 2026 alterations to the portal.

138. Plaintiffs' records contradict that explanation. In email communications with Late Stage following the alleged September 2024 sale, investors were not notified that their SpaceX interests were purportedly sold, despite directly asking about those interests. Plaintiffs did not receive any purported

emails informing them of a SpaceX sale, despite receiving other Late Stage emails during the relevant time periods.

139. Plaintiffs allege that Late Stage changed investor records after the fact to support a newly asserted September 2024 sale narrative, while failing to provide contemporaneous notice, transaction documents, proceeds, tax reports, or communications that would have been consistent with an actual sale.

140. Late Stage's statements raise serious questions regarding the existence, validity, documentation, and timing of the alleged sale.

## III. The Triller-Capital Truth Transaction

### A. Contemporaneous Timing and Similar Terms to Late Stage's Communication of the Alleged 2024 Sale

141. On June 23, 2026, the same day in which the Late Stage investor portal resumed operation, Triller and Trendy Reach entered into a Membership Interest Purchase Agreement with Capital Truth regarding the acquisition of SAC1.[29] Trendy Reach is a wholly owned subsidiary of Triller.

142. Public filings and transaction documents state that SAC1 is a Bahamian vehicle holding indirect ownership of 3,917,185 SpaceX common stock equivalents. The purchase price for the SAC1 transaction is $411,304,425, for a purchase price of approximately $105.00 per share. SAC1 holds those share equivalents through a limited-partner interest in a Fortune vehicle managed by Gigafund. *Id.*

143. This same per-share price appears in the retroactive email-history portal entries that purported to notify the Plaintiffs that their SpaceX shares had been sold.

144. Late Stage has repeatedly claimed investor SpaceX positions were sold at a pre-5:1 split price of $105 per share.

145. The timing and terms of the SAC1 transaction therefore reinforce that Plaintiffs' SpaceX interests may be included in the SAC1 transaction.

146. The SAC1 transaction was initially scheduled to close no later than July 22, 2026.

---

[29] **Exs. G, H.**

147. In the related *Evangelista* action, counsel for the Capital Truth entities later represented that the transaction had not closed because the buyer had not funded the transaction and had requested a 30-day extension.

148. On July 27, 2026, Capital Truth submitted the declaration of Ng Wing Fai, the CEO of both Triller and Trendy Reach.[30]

149. Fai stated that Trendy Reach had requested a 30-day extension beyond the original outside closing date. Fai further stated that the extension had been granted and that Trendy Reach now has until August 26, 2026 to consummate the SAC1 transaction.

150. Fai's declaration—executed in Doha, Qatar—attributes the failure to close on the "outbreak of armed conflict involving Iran," which disrupted funding "expected to be provided, in whole or in part, by lenders or investors based in Abu Dhabi and Singapore." Fai's declaration continues: "No funds or other consideration has been delivered to Capital Truth Holdings Ltd. or Capital Truth Holdings, Ltd. SAC1 or anyone else including any escrow agent," and that no interests or rights of any kind have been transferred.

151. In contrast, Triller's June 25, 2026 press release informed the market that the position was "financed through a secured financing arrangement" and that Triller "expects the transaction to close in the coming days."[31]

152. Fai's representations and Triller's press release confirm that the SAC1 transaction remains pending and capable of closing at any time on or even before August 26, 2026—and potentially as soon as financing is obtained.

153. The schedules included in Capital Truth's July 27, 2026 submission in the *Evangelista* litigation reveal additional material terms to the Membership Interest Purchase Agreement that were not included in Triller's original public SEC filing of the SAC1 transaction documents.[32]

---

[30] **Exhibit R**, Declaration of Ng Wing Fai.

[31] **Exhibit S**, Triller's June 25, 2026 Press Release.

[32] **Exhibit T**, Schedules to Membership Interest Purchase Agreement.

154. Schedule I to the Membership Interest Purchase Agreement identifies SAC1's indirect ownership through four Fortune Pre-IPO Offshore Fund classes: Class NNN, Class TTT, Class VVVV, and Class VVVVV. These classes collectively represent 3,917,185 post-5:1 split SpaceX share equivalents.

155. The same schedules include an "Illustrative Example of Carried Interest Contingencies" showing a 20% carried-interest charge applied to each relevant Fortune fund class. The illustrative calculation shows approximately 783,439 pre-5:1 split shares before carried interest or like charges and approximately 635,566 carry-adjusted pre-5:1 split shares after those charges.

156. The schedule's footnote states that, for avoidance of doubt, the pre-carried-interest or like charges before deductions represent approximately 783,000 shares, or approximately 3,915,000 shares after the 5:1 split, and that those interests will be reduced due to carried interest and like charges to approximately 635,000 shares, or approximately 3,175,000 shares after the 5:1 split.

157. Thus, the schedules indicate that carried interest or like charges will reduce the deliverable SpaceX share equivalents by approximately 148,000 pre-5:1 split shares, or approximately 740,000 post-5:1 split share equivalents.

158. Late Stage investors, including Plaintiffs, were not adequately informed that a substantial share-based carried interest or like charge would be deducted at the Capital Truth, SAC1, Fortune, Gigafund, or other upstream level prior to investor delivery or distribution.

**B. Capital Truth's Connection to Late Stage and the SpaceX Interests**

159. Capital Truth has been linked to Late Stage and persons or entities associated with Late Stage.

160. Capital Truth held or controlled the underlying pre-IPO securities or rights associated with securities sold to Late Stage investors.

161. Capital Truth is a successor entity to Capital Truth Holdings LLC. In November 2020, Capital Truth Holdings LLC merged into Capital Truth as a non-surviving entity. Both entities were or are controlled by Joshua Cilano, operated in the pre-IPO investment business, and have participated in the same investments.

162. In July 2020, Rohan Bhatia of Prior2IPO emailed Lifrieri of Sunny Ridge concerning the SpaceX investment opportunity. In that email, Bhatia explained that "Late Stage Fund is our fund," but

that "a fund cannot advertise," so Prior2IPO and Late Stage operated as separate entities to "follow all the rules." Bhatia further stated that investor money would go to Late Stage Fund and be held in a "series segregated fund."[33]

163. In the same email thread, Bhatia provided what he described as the "SpaceX contract." That "SpaceX contract" was a Stock Purchase Agreement dated July 13, 2020 between Capital Truth Holdings LLC, as seller, and Late Stage Fund X, LLC, as buyer.

164. The Stock Purchase Agreement stated that Capital Truth Holdings LLC was the record owner and holder of the SpaceX stock being sold. Exhibit A to the Stock Purchase Agreement identified 12,541 SpaceX shares at $285 per share, for a total purchase price of $3,574,185.[34]

165. The Stock Purchase Agreement directly ties Capital Truth entities to the sale of SpaceX shares to a Late Stage fund. The agreement also supports that Capital Truth entities were part of the structure through which Late Stage acquired, held, sold, or monetized SpaceX interests for Late Stage investors.

166. Upon information and belief, when Late Stage received money from its investors, it transferred the money to Capital Truth entities. Capital Truth would hold the actual shares of SpaceX until the IPO. Once the shares were publicly traded and the lock-up period expired, Capital Truth was supposed to distribute shares to Late Stage, who would in turn distribute the shares to Late Stage investors.

167. Capital Truth was also directly connected to Late Stage through an agreement concerning the sale of positions associated with Late Stage. A memorandum dated December 19, 2025 from Capital Truth to Late Stage Management, LLC confirmed a purported prior December 15, 2020 agreement between Capital Truth and Late Stage Management, LLC.[35]

168. The memorandum stated that Capital Truth had the "sole and expressed right to sell any positions assigned and assumed by Late Stage Management, LLC" so long as the sale of the position was

---

[33] **Exhibit U**, July 10, 2020 Email from Prior2IPO to John Lifrieri.

[34] **Ex. A**.

[35] **Ex. C**.

deemed beneficial to all parties. The memorandum was accepted and agreed to by Joshua Cilano for Capital Truth and Marcello Follano for Late Stage Management, LLC.

169. Follano is the founder of both Late Stage Asset Management, LLC and Capital Truth Advisors, LLC, both of which are named as Defendants in the *Evangelista* litigation.

170. Capital Truth and Late Stage appear to have operated through overlapping systems and infrastructure. For example, on July 27, 2026, multiple Late Stage investors, including Sunny Ridge, were able to log in to the Capital Truth investor portal using only their Late Stage credentials, despite never having any direct connection to Capital Truth.

171. Upon information and belief, Plaintiffs' rightful shares in SpaceX were transferred to or through Capital Truth Holdings Ltd., SAC1 from Capital Truth.

172. Capital Truth's July 27, 2026 submission in the *Evangelista* litigation did not answer the central chain-of-title question: whether the SpaceX interests held through SAC1, Fortune, and Gigafund are the same SpaceX interests that Late Stage sold to investors and later claimed had been liquidated.[36]

173. The Court expressly ordered the Capital Truth entities and Late Stage to detail the transfer of the alleged Liquidated Interests from Late Stage to any recipient, then to SAC1, including dates, amounts, entities, persons involved, and any interim transfers.[37]

174. The July 27 materials did not provide a complete transfer trail from Late Stage investors' SpaceX interests to Capital Truth, SAC1, Fortune, or Gigafund. The materials also did not clearly identify who purchased or received Late Stage's alleged liquidated interests.

### C. Capital Truth's Connection to Triller

175. Upon information and belief, Capital Truth has a significant financing and equity relationship with Triller. Through Capital Truth, Late Stage offered to its investors an opportunity to invest in pre-IPO shares in Triller.

176. Upon information and belief, in or around March 2026, Late Stage and Capital Truth acquired an increased block of shares in Triller stock.

---

[36] **Exhibit V**, July 27, 2026 Capital Truth Letter.

[37] **Exhibit W**, July 24, 2026 Order by Judge Matsumoto.

177. On or about January 31, 2023, Triller Hold Co LLC issued a 7.5% unsecured convertible promissory note to Capital Truth in the principal amount of up to $20 million.

178. On or about December 5, 2023, Triller Hold Co LLC and Capital Truth amended that note to increase the maximum principal amount to $30 million and extend the maturity date to April 30, 2024. The amendment was signed by Joshua Cilano for Capital Truth.[38]

179. In connection with Capital Truth's investments under the note, Triller Hold Co LLC also issued Capital Truth a warrant to purchase up to 4,231,311 Class B Common Units at a nominal exercise price of just $0.01 per unit.

180. Triller announced the $411 million acquisition of SAC1 from Capital Truth on June 25, 2026. Triller's share price jumped from $0.77/share at close on June 24, 2026, to $5.13/share at open on June 26, 2026, an increase of nearly 600%. As of July 20, 2026, Triller has a market capitalization of just $28.66 million.

181. Joshua Cilano, the control person for the Capital Truth entities, also has a significant personal and business relationship with Triller.

182. On June 23, 2025, a company named Triller Sweeps, LLC was incorporated in the state of Florida.[39] According to the company's articles of organization, Joshua Cilano and Heidi E. Paleno[40] were listed as persons authorized to manage the LLC. Triller Sweeps has since been touted by Triller as an important part of its future growth.

183. On June 10, 2026, at Triller's annual shareholder meeting, Triller provided a shareholder update presentation that described Triller Sweeps as a "Partner-Led Monetization Channel," named Triller Sweeps as a component of its "Social / Creator Monetization" strategy, and identified "[j]umpstart[ing] Triller Sweeps" as a key element of its strategy for the following 0-6 months.[41]

---

[38] **Exhibit X**, Amendment to Unsecured Convertible Promissory Note.

[39] **Exhibit Y**, Articles of Organization for Triller Sweeps, LLC.

[40] Heidi E. Paleno is listed at the same address as Joshua Cilano: 5090 PGA Boulevard, Suite 312, Palm Beach Gardens, FL. Heidi E. Paleno is also the registered agent for Royal Escrow Services, LLC, which is the escrow agent being used in the SAC1 transaction. Royal Escrow Services, LLC is also listed as registered at Cilano's address.

[41] **Exhibit Z**, Triller FY2026 Shareholder Update Presentation, at 6, 14, 21.

184.     On June 29, 2026, in response to shareholder questions following the annual meeting, Triller noted that "Triller Sweeps and other partner-led models can add additional revenue paths."[42]

185.     On April 11, 2026, Triller released a letter to members of Capital Truth expressing its "sincere gratitude to Joshua Cilano of Capital Truth." The letter further indicated that Cilano's close cooperation with Triller "truly mattered," and that Triller was "proud to count Capital Truth as a long-standing supporter of [the] Company."[43]

186.     These facts support that the SAC1 transaction is not an ordinary market transaction between wholly unrelated parties.

187.     Upon information and belief, Plaintiffs' SpaceX interests are being sold in the SAC1 acquisition. The contemporaneous timing of Late Stage's removal of Plaintiffs' SpaceX shares from the portal and all records and the close relationships between Triller, Capital Truth, and Late Stage indicate that these events are connected.

## IV.     The Related EDNY Proceedings

188.     This action is directly related to *Evangelista v. Late Stage Asset Management, LLC*, No. 1:24-cv-05292-KAM-MMH, pending before Judge Kiyo A. Matsumoto in the Eastern District of New York.

189.     The plaintiff in the related action is Armand Evangelista, individually and on behalf of all others similarly situated.

190.     The defendants in the related action include Late Stage Asset Management, LLC, Capital Truth Holdings LLC, Capital Truth Advisors, LLC, Marcello Follano, Joshua Cilano, and other persons and entities alleged to have participated in the Late Stage pre-IPO investment structure.

191.     The related action concerns Late Stage's sale of pre-IPO investment interests, including interests in private companies, and the role of Capital Truth-related entities and individuals in acquiring, holding, transferring, or monetizing those interests.

---

[42] **Exhibit AA**, June 29, 2026 Triller Responses to Shareholder Questions, at 2.

[43] **Exhibit BB**, Triller Letter to Capital Truth Members.

192. In July 2026, the plaintiff in the related action sought emergency injunctive relief concerning SpaceX interests and the proposed SAC1 transaction.

193. On July 21, 2026, Judge Matsumoto held a hearing on the plaintiff's motion for a temporary restraining order seeking to enjoin the sale of SAC1, owned by Capital Truth, to Trendy Reach, a subsidiary of Triller.

194. At the July 21 hearing, the Court questioned whether Triller, Trendy Reach, Capital Truth, and SAC1 had been given adequate notice or were properly before the Court.

195. The Court observed that the plaintiff in the related action was seeking injunctive relief affecting parties that had not been named in the operative complaint and had not appeared. The Court further observed that SpaceX was not specifically pleaded in the operative complaint in the related action.

196. The Court stated that the plaintiff could file an amended complaint or a new complaint naming all parties against whom injunctive relief was sought regarding the sale of SAC1.

197. The Court denied the TRO without prejudice because necessary parties were not before the Court and because the operative complaint did not specifically plead the SpaceX transaction.

198. The Court nevertheless found that the plaintiffs in the related action had alleged serious misconduct and stated that the plaintiffs appeared likely to succeed on the merits.

199. To preserve assets while addressing the procedural deficiencies, the Court ordered that proceeds of the SAC1 transaction be transferred by the transaction's Escrow Agent to the Clerk of Court for the Eastern District of New York and deposited into an interest-bearing account pending further order of the Court. The Escrow Agent was identified by the Court as Royal Escrow Services, LLC. The Court ordered that the escrowed funds be transferred to the Clerk of Court no later than noon on July 23, 2026.

200. No transaction proceeds were transferred to the Clerk of Court by noon on July 23, 2026. Cilano represented that the funds were not transferred because the SAC1 transaction did not close.

201. On July 24, 2026, the plaintiff in the related action filed another request for temporary restraining order concerning the same disputed SpaceX interests and the SAC1 transaction.

202. On the same day, after denying the TRO, Judge Matsumoto held a status conference in the related action regarding the disputed SpaceX interests, Late Stage's alleged liquidation notices, the SAC1 transaction, and the renewed request for emergency relief.

203.     The Court asked the Capital Truth entities and Cilano for information surrounding the SAC1 transaction. After repeated limited answers or outright non-answers, including Cilano's invocation of his Fifth Amendment rights to self-incrimination, the Court ordered that the Capital Truth entities, Late Stage, Follano, and Cilano file sworn affidavits by July 27, 2026.[44]

204.     The Court ordered those parties to identify all persons and entities involved in Late Stage's alleged liquidation of 70-80% of its SpaceX interests, including any purchaser of the Liquidated Interests.

205.     The Court ordered those parties to identify all persons and entities who received Late Stage's Liquidated Interests and to provide contact information for each recipient.

206.     The Court ordered those parties to state whether Late Stage, Follano, or any other person or entity received consideration for the Liquidated Interests, what consideration was received, and whether any consideration or accounting had been distributed to investors.

207.     The Court ordered those parties to confirm whether the remaining 20-30% of Late Stage's SpaceX interests remained with Late Stage or had been liquidated or transferred.

208.     The Court ordered those parties to identify the principals of Capital Truth, SAC1, and Trendy Reach, and to detail the specific relationship SAC1 has to the approximately 3.9 million SpaceX share equivalents.

209.     The Court ordered those parties to detail the transfer of the Liquidated Interests from Late Stage to any receiving entity, from that entity to SAC1, and through any interim transfers.

210.     The Court ordered those parties to confirm whether the rights in SpaceX shares held by SAC1 are the same as the Liquidated Interests once held by Late Stage.

211.     The Court also ordered those parties to explain the discrepancy between prior representations identifying Royal Escrow Services, LLC as the escrow agent and a later filing identifying Royal Title and Closing.

212.     The Court further ordered a CPA accounting by July 31, 2026 identifying which entity or entities now hold Late Stage investors' rights or interests to SpaceX shares.

---

[44] *See* **Ex. W**.

213. On July 27, 2026, Capital Truth-related parties submitted a letter and supporting materials in response to the Court's order.[45]

214. The July 27 Capital Truth submission represented that neither Joshua Cilano, Capital Truth, SAC1, Late Stage, nor Marcello Follano had received consideration directly or indirectly from Trendy Reach in connection with the SAC1 transaction.

215. The July 27 Capital Truth submission attached or referenced the Membership Interest Purchase Agreement for the SAC1 transaction.

216. The Membership Interest Purchase Agreement states that SAC1 owns certain class interests in Fortune Pre-IPO Offshore Fund Ltd., Gigafund-managed vehicles.

217. The Membership Interest Purchase Agreement states that those Fortune fund interests represent SAC1's indirect ownership of 3,917,185 SpaceX common stock equivalents.

218. The Membership Interest Purchase Agreement states that the purchase price for SAC1 is $411,304,425, representing an indirect purchase price of $105 per SpaceX share equivalent.

219. The Membership Interest Purchase Agreement states that SAC1 does not own assets other than the Fortune fund interests. The Membership Interest Purchase Agreement states that the Fortune fund interests grant the holder the right to take title to the SpaceX shares at the time and in the discretion of the owner of those interests.

220. The Membership Interest Purchase Agreement further provides that, at closing, Trendy Reach would acquire all of Capital Truth's rights in SAC1, including rights relating to the Fortune fund interests, the related governing documents, and the SpaceX share equivalents.

221. The July 27 Capital Truth submission also included a signed extension of the Membership Interest Purchase Agreement, pushing the closing deadline to August 26, 2026.[46] This extension modified the MIPA to provide that any funds paid into escrow during the pendency of the Transaction would be held in the escrow account of Gusrae Kaplan Nusbaum PLLC, the attorneys for Cilano and the Capital Truth entities. The extension contradicted Gusrae Kaplan Nusbaum PLLC's representation, on behalf of Cilano

---

[45] *See* **Ex. V**.

[46] **Ex. I**.

and the Capital Truth entities, that "[they] could do the extension and **any moneys that would be paid under the extension would go directly to the Clerk of the Court**."[47]

222. The July 27 Capital Truth submission also represented that the underlying shares held by the Fortune funds are not accessible for twelve months after SpaceX went public, placing potential receipt of the underlying shares in or around June 2027.

223. The July 27 Capital Truth materials did not provide the complete chain of title showing how Plaintiffs' or Late Stage investors' SpaceX interests moved from Late Stage to Capital Truth, SAC1, Fortune, Gigafund, or any other entity.

224. The July 27 Capital Truth materials did not clearly identify any purchaser of Late Stage's alleged Liquidated Interests.

225. The July 27 Capital Truth materials did not identify all persons or entities who received Late Stage's alleged Liquidated Interests.

226. The July 27 Capital Truth materials did not clearly state whether SAC1's 3,917,185 SpaceX share equivalents are the same interests as the Liquidated Interests that Late Stage told investors had been liquidated.

227. The July 27 Capital Truth materials did not identify the current owner, holder, custodian, or controller of any Late Stage investor's SpaceX interests not held by SAC1.

228. The July 27 Capital Truth materials did not identify where the remaining 20-30% of Late Stage's SpaceX interests are held.

229. The July 27 Capital Truth materials stated that no consideration had been received from Trendy Reach in connection with the SAC1 transaction, but did not fully answer whether any consideration had been received from any other person or entity in connection with any alleged liquidation or transfer of Late Stage investor interests.

230. Capital Truth also submitted a declaration from Ng Wing Fai in the related EDNY action.[48]

---

[47] **Ex. J**, at 31.

[48] **Ex. R**.

231.     Ng Wing Fai stated that he is the Group Chief Executive Officer and a director of Triller and the Chief Executive Officer of Trendy Reach.

232.     Ng Wing Fai stated that Trendy Reach requested a 30-day extension beyond the original outside closing date so that Trendy Reach could continue to pursue funding necessary to complete the SAC1 transaction.

233.     Ng Wing Fai stated that the extension had been granted and that Trendy Reach now has until August 26, 2026 to consummate the SAC1 transaction.

234.     Ng Wing Fai attributed the failure to close by the original outside closing date to delayed funding from lenders or investors in Abu Dhabi and Singapore and regional instability in the Middle East.

235.     The July 27 materials did not include financing commitments, lender communications, investor communications, escrow-funding confirmations, or other documentary proof establishing that the stated funding-delay explanation is complete.

236.     Joshua Cilano also submitted a declaration in the related EDNY action.

237.     Cilano stated that he submitted the declaration in his capacity as custodian of records for Capital Truth and SAC1.[49]

238.     Cilano stated that his limited compliance with the Court's order was not intended to waive his Fifth Amendment privilege against self-incrimination.

239.     Cilano authenticated certain Capital Truth records, including the Membership Interest Purchase Agreement, schedules to the Membership Interest Purchase Agreement, Capital Truth's Bahamian certificate of incorporation, a spreadsheet of SpaceX interests purchased by Capital Truth, and a fully executed extension notice dated July 26, 2026.

240.     Cilano's declaration did not provide personal testimony answering whether Plaintiffs' or Late Stage investors' SpaceX interests are included in SAC1.

241.     Cilano's declaration did not provide a complete transfer trail from Late Stage investor interests to Capital Truth, SAC1, Fortune, or Gigafund.

---

[49] **Ex. CC**, July 27, 2026 Declaration of Joshua Cilano.

242. Cilano's declaration did not identify where the remaining 20-30% of Late Stage's SpaceX interests are held.

243. Marcello Follano also submitted a declaration in the related EDNY action. [50]

244. As to all questions, Follano invoked the Fifth Amendment.

245. The July 27 materials did not provide the CPA accounting ordered by the Court to identify which entity or entities now hold Late Stage investors' rights or interests to SpaceX shares.

246. These unanswered questions confirm that Plaintiffs cannot determine from Defendants' records or disclosures whether Plaintiffs' SpaceX interests are held by Late Stage, Capital Truth, SAC1, Fortune, Gigafund, or another person or entity.

247. These unanswered questions also confirm that preservation and injunctive relief is necessary before the SAC1 transaction is funded, closed, extended further, transferred, or otherwise modified.

248. Plaintiffs request that an adverse inference be drawn against Follano, Cilano, and the entities they represent as to all questions posed by the Court that were only partially answered or not answered.

## V. Plaintiffs Placed Defendants on Notice

249. On July 17, 2026, Plaintiffs placed Triller, Trendy Reach, Capital Truth, and Late Stage on notice of their disputed claims.

250. Plaintiffs demanded that Triller and Trendy Reach pause or suspend the SAC1 transaction until the disputed investor claims were resolved.

251. Plaintiffs demanded that Capital Truth refrain from transferring, assigning, or disposing of any SpaceX-related interests, proceeds, or rights connected to SAC1.

252. Plaintiffs demanded that Late Stage provide them with their rightful SpaceX interests.

253. Defendants have not provided adequate assurances that the SAC1 transaction will be paused, the funds will be preserved, or that the SpaceX holdings will not be transferred. While the funds will now be preserved, by Court order, if the SAC1 transaction closes, the SpaceX interests at issue are not under a preservation order.

---

[50] **Ex. K**, July 27, 2026 Declaration of Marcello Follano.

254. Plaintiffs therefore bring this action to determine their rights and to prevent the transfer of disputed SpaceX interests before their ownership and entitlement can be adjudicated.

## FIRST CAUSE OF ACTION
### Declaratory Relief
### (Against All Defendants)

255. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

256. An actual controversy exists between Plaintiffs and Defendants regarding ownership and control of the disputed SpaceX shares.

257. Plaintiffs contend that they purchased and are entitled to receive SpaceX shares traceable to their SpaceX pre-IPO investments through Late Stage.

258. Capital Truth claims the right to sell SAC1, which holds the interests representing 3,917,185 SpaceX share equivalents.

259. Triller and Trendy Reach, claim the right to acquire SAC1 and the SpaceX share equivalents held by, through, or for SAC1.

260. Gigafund and Fortune are alleged to control, manage, hold, or administer SpaceX shares, share equivalents, or fund interests implicated by SAC1.

261. Plaintiffs contend that the SpaceX share equivalents being transferred through the SAC1 transaction include SpaceX shares purchased with Plaintiffs' funds through Late Stage.

262. Defendants have failed to acknowledge Plaintiffs' rights.

263. Plaintiffs seek a judicial declaration identifying the owner, holder, custodian, manager, controller, and beneficiary of the SpaceX shares, share equivalents, and fund interests implicated by the SAC1 transaction.

264. Plaintiffs seek a judicial declaration that Late Stage, Capital Truth, SAC1, Triller, Trendy Reach, Gigafund, Fortune, and any related entities may not transfer, release, encumber, sell, distribute, monetize, or otherwise dispose of SpaceX interests traceable to Plaintiffs' investments unless and until Plaintiffs' rights are adjudicated or adequately protected.

265. Plaintiffs seek a judicial declaration that Triller and Trendy Reach may not accept or acquire any SpaceX interests traceable to Plaintiffs' investments unless and until Plaintiffs' rights are adjudicated or adequately protected.

266. Plaintiffs further seek a judicial declaration that they have a greater right of possession to the disputed SpaceX interests than the Defendants.

267. Declaratory relief is necessary and appropriate to determine the parties' rights and obligations regarding the disputed SpaceX interests and related proceeds.

## <u>SECOND CAUSE OF ACTION</u>
### Constructive Trust
### (Against All Defendants)

268. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

269. It is appropriate to impose a constructive trust in situations when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest. *Homapour v. Harounian*, 182 A.D.3d 426, 427, 122 N.Y.S.3d 282, 284 (2020). The elements of constructive trust include (1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment. *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121 (1976). A confidential relationship is a relationship of trust and confidence. *See id*.

270. Plaintiffs invested funds to acquire pre-IPO SpaceX securities through Late Stage.

271. Late Stage represented to Plaintiffs that their funds were applied to specific SpaceX share positions.

272. Late Stage's investor portal, monthly holdings reports, and other account records reflected Plaintiffs' SpaceX holdings for years.

273. Plaintiffs did not authorize the sale or disposition of their SpaceX interests.

274. Plaintiffs did not receive contemporaneous notice of or proceeds from any alleged 2024 sale.

275. Plaintiffs have a right to the SpaceX shares or share equivalents traceable to their investments.

276. The specific res at issue is Plaintiffs' pre-IPO SpaceX interests.

277. Plaintiffs are informed and believe that Capital Truth, SAC1, or related entities hold or control SpaceX share equivalents traceable to Plaintiffs' investments.

278. Plaintiffs are informed and believe that Triller is attempting to acquire those SpaceX share equivalents through the SAC1 transaction after receiving notice of Plaintiffs' disputed claims.

279. Plaintiffs are informed and believe that Defendants obtained or seek to acquire Plaintiffs' SpaceX share equivalents through wrongful acts, including but not limited to conversion.

280. Defendants hold, control, and seek to either transfer or acquire identifiable property that belongs to Plaintiffs or is traceable to their investments.

281. Defendants obtained, hold, control, transfer, or seek to acquire Plaintiffs' SpaceX share equivalents through wrongful acts, including fraud, conversion, concealment, violation of trust, failure to account, and failure to distribute proceeds.

282. Defendants would be unjustly enriched if they retain, transfer, acquire, or receive the disputed SpaceX interests or proceeds without restoring Plaintiffs' property or adequately protecting Plaintiffs' rights.

283. Equity requires Defendants to be treated as involuntary trustees of the disputed SpaceX share equivalents and their traceable proceeds for the benefit of Plaintiffs.

284. A constructive trust is an appropriate equitable remedy under these facts because Defendants wrongfully hold SpaceX shares that belong to the Plaintiffs.

285. Plaintiffs therefore seek imposition of a constructive trust over all SpaceX shares, share equivalents, and proceeds traceable to Plaintiffs' investments.

### THIRD CAUSE OF ACTION
**Conversion**
**(Against All Defendants)**

286. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

287. Plaintiffs own, have a right to possess, or have an economic entitlement to, identifiable SpaceX shares, share equivalents, or proceeds traceable to their investments through Late Stage.

288. Late Stage's own records, reports, and investor portal reflected Plaintiffs' SpaceX interests for years.

289. Plaintiffs did not consent to the sale or liquidation of their SpaceX interests.

290. Plaintiffs did not authorize Late Stage, Capital Truth, Triller, or any related person or entity to dispose of their SpaceX interests.

291. Capital Truth is attempting to transfer SAC1 and the embedded SpaceX interests traceable to Plaintiffs' investments.

292. Triller and Trendy Reach are attempting to acquire SAC1 and the embedded SpaceX interests traceable to Plaintiffs' investments.

293. Defendants have been placed on actual notice that Plaintiffs claim rights in the SpaceX interests implicated by the SAC1 transaction.

294. By transferring, acquiring, accepting, or exercising control over disputed SpaceX interests or proceeds after notice of Plaintiffs' claims, Defendants have exercised or threatened to exercise dominion over Plaintiffs' property inconsistent with Plaintiffs' rights.

295. Plaintiffs have been damaged by Defendants' conduct in an amount to be proven at trial.

296. Plaintiffs seek damages, constructive trust, and injunctive relief.

### <u>FOURTH CAUSE OF ACTION</u>
**Fraud**
**(Against Late Stage, Capital Truth, Follano, and Cilano)**

297. Plaintiffs incorporate by reference all preceding paragraphs.

298. Late Stage and Capital Truth made, participated in, benefited from, or concealed material misrepresentations and omissions concerning Plaintiffs' SpaceX investments.

299. Late Stage represented to Plaintiffs that their funds were applied to specific pre-IPO SpaceX positions.

300. Late Stage represented for years through portal records, monthly holdings reports, acceptance letters, side letters, and tax records that Plaintiffs' SpaceX positions remained held.

301. Late Stage later represented, after the June 2026 portal outage, that Plaintiffs' SpaceX positions had actually been sold in September 2024.

302. Late Stage represented that investor notices had been sent in September 2024 concerning the alleged SpaceX sale.

303. Late Stage represented that Plaintiffs failed to act on those alleged notices or provide wire instructions.

304. These representations were false or misleading when made.

305. David never received the alleged SpaceX sale notice, and the portal email-history entry for that alleged notice appeared with one date on June 23, 2026 and a different date on June 26, 2026.

306. Kottu never received the alleged SpaceX sale notice, and Late Stage's June 9, 2026 communication treated Kottu's SpaceX position as active and subject to future IPO, split, lockup, and delivery events.

307. Sunny Ridge never received the alleged SpaceX sale notice, and its records show irreconcilable versions of monthly holdings reports.

308. Late Stage's misrepresentations and omissions were part of a broader pattern affecting investor records.

309. Late Stage altered or regenerated historical monthly holdings reports after the June 2026 portal outage, including reports for periods before the alleged discovery of the supposed portal error.

310. In some instances, the same historical monthly report changed more than once, at one point removing a SpaceX position and later reflecting both a SpaceX position and an "unapplied contribution."

311. These alterations support Plaintiffs' allegation that the September 2024 sale narrative was created or reconstructed after the fact.

312. Late Stage concealed or omitted the alleged September 2024 sale when communicating with Plaintiffs after that date.

313. Late Stage concealed or omitted the alleged September 2024 sale when responding to Kottu on June 9, 2026 with forward-looking delivery instructions.

314. Late Stage concealed or omitted the alleged September 2024 sale when representing to investors on December 7, 2024 that all of their holdings were "stable."

315. Late Stage concealed or omitted the alleged September 2024 sale when responding to Lifrieri on January 14, 2025 regarding whether Sunny Ridge could sell its SpaceX interest at current market value.

316. Late Stage's K-1s and tax records failed to report a 2024 sale in the manner expected if the alleged September 2024 sale had occurred.

317. Capital Truth participated in and benefited from the structure through which SpaceX interests were acquired, held, sold, transferred, or monetized for Late Stage funds and investors.

318. Capital Truth-related entities sold SpaceX shares to Late Stage Fund X, LLC under the July 13, 2020 Stock Purchase Agreement.

319. Capital Truth later confirmed it had the sole right to sell positions assigned and assumed by Late Stage.

320. Upon information and belief, Capital Truth and Cilano knew or should have known that SpaceX-related positions were investor-funded and associated with Late Stage investor interests.

321. Upon information and belief, Capital Truth and Cilano knew or should have known that selling, transferring, or monetizing those positions without proper notice, authorization, accounting, or distribution would mislead investors and deprive them of their property.

322. Upon information and belief, Late Stage, Capital Truth, Follano, and Cilano acted knowingly, intentionally, recklessly, or with conscious disregard for Plaintiffs' rights.

323. The misrepresentations and omissions were material because they concerned whether Plaintiffs owned SpaceX interests, whether those interests had been sold, whether sale proceeds existed, whether Plaintiffs were required to provide wire instructions, and whether Plaintiffs' rights were being preserved.

324. Plaintiffs reasonably relied on Late Stage's account records, portal records, monthly holdings reports, tax records, and communications because Late Stage was the sole source of information concerning Plaintiffs' indirect SpaceX interests.

325. Plaintiffs had no independent ability to verify whether Late Stage, Capital Truth, SAC1, Fortune, Gigafund, or related entities continued to hold Plaintiffs' SpaceX interests.

326. Plaintiffs were damaged by the fraudulent conduct because Plaintiffs lost access to Plaintiffs' SpaceX interests, did not receive Plaintiffs' shares, did not receive proceeds, and face the imminent risk that the SpaceX share equivalents or proceeds will be transferred or dissipated through the SAC1 transaction.

327. Plaintiffs seek actual damages, rescissory relief where appropriate, restitution, disgorgement, constructive trust, injunctive relief, punitive damages to the extent permitted by law, and all other available relief.

## <u>FIFTH CAUSE OF ACTION</u>
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against Late Stage, Capital Truth, Follano, and Cilano)**

328. Plaintiffs incorporate by reference all preceding paragraphs.

329. Plaintiffs' Late Stage fund interests and SpaceX-related investment interests were securities.

330. This claim arises from the unauthorized disposition of Plaintiffs' securities in 2024 through 2026 and the deceptive scheme that accompanied and concealed it, including fabricated and backdated sale records and false liquidation notices generated in 2026. Plaintiffs were forced, involuntary sellers of those securities.

331. In connection with the purchase, sale, holding, liquidation, transfer, or monetization of those securities, Late Stage and Capital Truth, directly or indirectly, by use of the means or instrumentalities of interstate commerce, made untrue statements of material fact, omitted material facts necessary to make statements not misleading, and engaged in a scheme to defraud.

332. Late Stage, Capital Truth, Follano, and Cilano represented that Plaintiffs' funds were applied to specific SpaceX positions.

333. Late Stage, Capital Truth, Follano, and Cilano represented or caused Plaintiffs to believe, through portal records, holdings reports, tax documents, and communications, that Plaintiffs' SpaceX positions remained held.

334. Late Stage later represented that those positions had been sold in September 2024, even though Plaintiffs did not receive contemporaneous notice, did not authorize any sale, did not receive proceeds, and continued to receive records inconsistent with a 2024 sale.

335. The alleged September 2024 sale was material because it determined whether Plaintiffs owned SpaceX interests, were entitled to delivery of SpaceX shares or share equivalents, were entitled to sale proceeds, or were required to take any action to receive distributions.

336. The newly-revealed carried interest schedules to the Membership Interest Purchase Agreement reveal that Defendants claim the right to deduct substantial carried interest or like charges in the form of SpaceX share equivalents before delivery or distribution to investors.

337. Those deductions were material because they affected the number of SpaceX shares, share equivalents, or proceeds that investors would receive.

338. Late Stage, Capital Truth, Follano, and Cilano acted with scienter, including intent to deceive or, at minimum, recklessness, because their own records, K-1s, portal data, investor communications, and post-outage alterations contradicted the purported September 2024 sale.

339. The strong inference of scienter is further supported by, among other things: (1) the fabrication and backdating of sale notices and portal records; (2) the creation of false emails; (3) the alteration of historical holding reports in July 2026; (4) the exact $105 purported sale price of Plaintiffs' shares and the SAC1 transaction acquisition price; (5) Cilano's invocation fo the Fifth Amendment; and (6) Follano's invocation of the Fifth Amendment.

340. Plaintiffs were not adequately informed that their SpaceX interests could be reduced by upstream carried interest or like charges imposed through Capital Truth, SAC1, Fortune, Gigafund, or related entities.

341. Upon information and belief, these deductions operated as hidden compensation, hidden markup, or undisclosed profit participation in connection with Plaintiffs' securities transactions.

342. Had Plaintiffs known that their SpaceX interests could be reduced by undisclosed upstream carried interest or like charges, Plaintiffs would have demanded different terms or would have taken action to protect their rights earlier.

343. Plaintiffs relied on Late Stage's, Capital Truth's, Follano's, and Cilano's representations and omissions because Late Stage controlled the investor records and Plaintiffs had no independent means to verify the status, custody, sale, or proceeds of their indirect SpaceX interests.

344. Plaintiffs suffered damages as a direct and proximate result of the deceptive conduct, including loss of access to their SpaceX interests, failure to receive shares or proceeds, and threatened transfer or dissipation of traceable SpaceX share equivalents and proceeds.

345. Plaintiffs seek damages and equitable relief available under the federal securities laws.

**SIXTH CAUSE OF ACTION**
**Violation of Section 20(a) of the Exchange Act**
**(Against Cilano and Follano)**

346. Plaintiffs incorporate by reference all preceding paragraphs.

347. Cilano controlled Capital Truth and SAC1, and Follano controlled the Late Stage enterprise, within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Each was a culpable participant in the primary violations alleged above and is jointly and severally liable for them.

**SEVENTH CAUSE OF ACTION**
**Fraudulent Conveyance – NY DCL §§ 273-76**
**(Against All Defendants)**

348. Plaintiffs hold claims against Cilano, Capital Truth, and SAC1 within the meaning of the New York Debtor & Creditor Law. The transfers and attempted transfers alleged herein — including the movement of investor-funded SpaceX interests into and among Capital Truth, SAC1, and the Fortune structure; the 2020–2023 "redemptions" whose proceeds were transferred to Late Stage; the proposed transfer of the SpaceX block to Trendy Reach for $105 per share equivalent against a materially higher market price; and the proposed diversion of approximately 740,000 share equivalents as "carried interest and like charges" — were made or undertaken with actual intent to hinder, delay, or defraud creditors, and/or without fair consideration or reasonably equivalent value.

349. Badges of actual fraud include: the fabrication and backdating of investor records; transfers to and among insiders under common control; concealment of the transfers and of the chain of title; the retention of control by the transferors; the below-market transfer price; an escrow agent formed eleven weeks before the transaction that shares a manager and address with entities Cilano manages; the redirection of escrowed funds to the transferors' own litigation counsel in contravention of a court order; and the absence of any consideration actually paid.

350. Plaintiffs are entitled to avoidance of the transfers, preservation and attachment-type relief against the transferred property, and attorneys' fees under N.Y. Debtor & Creditor Law § 276-a.

**REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

351. Plaintiffs incorporate by reference all preceding paragraphs.

352. Plaintiffs have shown a substantial likelihood of success, or at minimum serious questions going to the merits, concerning Plaintiffs' rights to SpaceX shares, share equivalents, transfer rights, fund interests, escrowed funds, and traceable proceeds.

353. Plaintiffs face immediate and irreparable harm absent injunctive relief.

354. The SAC1 transaction threatens to transfer, monetize, release, encumber, or dissipate SpaceX share equivalents, related fund interests, escrowed funds, or proceeds before Plaintiffs' rights can be adjudicated.

355. Monetary damages alone are inadequate because Plaintiffs seek specific SpaceX shares, share equivalents, transfer rights, fund interests, and traceable proceeds.

356. Once transferred through foreign entities, fund vehicles, acquisition subsidiaries, escrow arrangements, or other structures, the disputed property and proceeds may become difficult or impossible to trace and recover.

357. The balance of equities favors preservation of the status quo.

358. Defendants will suffer no cognizable harm from preserving disputed property and proceeds until the Court determines ownership, traceability, and entitlement.

359. The public interest favors preserving disputed investor property, preventing transfer of assets after notice of competing claims, and ensuring that courts can determine ownership before disputed property is moved or dissipated.

360. Plaintiffs seek an injunction restraining Defendants, their officers, directors, agents, employees, attorneys, subsidiaries, affiliates, representatives, and all persons acting in active concert or participation with them who receive actual notice, from:

    a. closing, extending, funding, consummating, or further performing the SAC1 transaction to the extent it involves SpaceX shares, share equivalents, related fund interests, transfer rights, escrowed funds, or proceeds traceable to Late Stage investor interests;

    b. transferring, assigning, selling, releasing, encumbering, pledging, hypothecating, monetizing, or otherwise disposing of any SpaceX shares, SpaceX share equivalents, SAC1 interests, Fortune interests, Gigafund-managed interests, transfer rights, escrowed funds, or proceeds traceable to Plaintiffs' investments;

c. authorizing, directing, requesting, accepting, or causing the release, transfer, disbursement, commingling, or dissipation of escrowed funds, sale proceeds, or other consideration connected to the SAC1 transaction;

d. destroying, altering, modifying, deleting, concealing, transferring, or failing to preserve documents, communications, electronically stored information, metadata, portal records, transaction records, escrow records, transfer documents, chain-of-title records, fund records, account records, K-1 records, and communications relating to Plaintiffs' SpaceX interests, Late Stage, Capital Truth, SAC1, Triller, Trendy Reach, Gigafund, Fortune, or the SAC1 transaction; and

e. taking any action that would impair the Court's ability to determine ownership, custody, control, traceability, or entitlement to the disputed SpaceX interests or proceeds.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Declare that Plaintiffs have disputed rights and claims concerning the SpaceX shares, share equivalents, and proceeds implicated by the SAC1 transaction;

b. Declare the ownership, custody, control, and chain of title of the disputed SpaceX shares, SpaceX share equivalents, SAC1 interests, Fortune interests, Gigafund-managed interests, transfer rights, escrowed funds, and traceable proceeds;

c. Declare that Capital Truth, SAC1, Triller, Trendy Reach, Gigafund, Fortune, and any related entities may not sell, transfer, release, encumber, monetize, or otherwise dispose of any SpaceX shares or share equivalents traceable to Plaintiffs' SpaceX investments unless and until Plaintiffs' rights are adjudicated or adequately protected;

d. Declare that Triller and Trendy Reach may not acquire, accept, receive, or benefit from SpaceX shares or share equivalents traceable to Plaintiffs' SpaceX investments unless and until Plaintiffs' rights are adjudicated or adequately protected;

e. Impose a constructive trust over all SpaceX shares, share equivalents, SAC1 interests, Fortune interests, Gigafund-managed interests, transfer rights, escrowed funds, proceeds, profits, appreciation, or other property traceable to Plaintiffs' SpaceX investments;

f. Order that any funds paid in connection with the SAC1 transaction (or with any other related entity) be transmitted to the Clerk of Court for deposit in an interest-bearing account pending adjudication of this dispute;

g. Order that any disputed share equivalents and/or control interests be held by a Court-approved custodian pending adjudication of this dispute;

h. Avoid the fraudulent conveyances alleged herein;

i. Award Plaintiffs actual damages in an amount according to proof;

j. Award Plaintiffs punitive damages to the extent permitted by law;

k. Award Plaintiffs pre-judgment and post-judgment interest in the amount permitted by law;

l. Award Plaintiffs their attorneys' fees and costs as permitted by law;

m. Grant preliminary and permanent injunctive relief, including to enjoin Defendants from transferring, monetizing, releasing, dissipating, encumbering, extending, funding, closing, or accepting disputed SpaceX interests or proceeds;

n. Relate this case to Evangelista v. Late Stage Asset Management, LLC, No. 1:24-cv-05292-KAM-MMH, and consolidate or coordinate proceedings as appropriate;

o. Grant Plaintiffs a trial by jury on all issues so triable;

p. Grant leave to amend these pleadings to conform to evidence produced in discovery or at trial; and

q. Grant such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs, by counsel, demand a trial by jury.

Dated: July 29, 2026                    Respectfully submitted,


                                        */s/ Andrew C. Wolinsky*_____
                                        **BATHAEE DUNNE LLP**
                                        Andrew C. Wolinsky (SBN 4892196)
                                        445 Park Ave, Floor 9
                                        New York, NY 10022-8606
                                        Tel: (332) 208-7337
                                        awolinsky@bathaeedunne.com

**WRIGHT CLOSE BARGER & GUZMAN LLP**
Randall C. Owens*
Mukul S. Kelkar*
Chetan G. Reddy*
700 Louisiana Ave
Suite 3000
Houston, TX 77002
Tel: (713) 572-4321
owens@wcbglaw.com
mkelkar@wcbglaw.com
creddy@wcbglaw.com

* *Pro Hac Vice* applications to be submitted.

*Counsel for Plaintiffs*